In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.

Bankruptcy No. 89–8191–8P1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 20, 1993.

Harley E. Riedel, Oppenheimer, Wolff & Donnelly, for debtor.

Paul A. Bilzerian, for claimant.

William Goldman, for Creditors Committee.

James C. Orr, Chapter 7 Trustee for Paul Bilzerian.

Stephen L. Meininger, Roberta Colton, Andrew Brumby, Paul Singerman, for Chapter 7 Trustee, James C. Orr.

## ORDER ON DEBTOR'S OBJECTION TO CLAIM # 3576 FILED BY PAUL A. BILZERIAN

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a confirmed Chapter 11 case and the matter under consideration is an Objection by Bicoastal Corporation, d/b/a Simuflite, f/k/a The Singer Company (Debtor) to the Amended Claim filed by Paul A. Bilzerian (Bilzerian), the former Chief Executive Officer and Chairman of the Board of the Debtor. The Claim was originally filed on January 31, 1990, as Claim No. 2799 for an undetermined amount of money. In the meantime, Bilzerian himself became a Debtor who originally sought relief under Chapter 11 on August 5, 1991, but later converted his case to a Chapter 7 liquidation case on October 22, 1991. After obtaining relief from the automatic stay, the Debtor objected to Bilzerian's initial claim on May 1, 1992, on the grounds that the claim was facially defective. The objection was sustained and the Court disallowed Claim No. 2799 on June 18, 1992. The Order of disallowance was without prejudice with leave granted to Bilzerian to file an amended claim. Bilzerian filed an Amended Claim, and this is the claim sought to be disallowed by the Debtor.

Bilzerian in his Amended Claim seeks liquidated amounts of $605,316.43, in addition to unspecified unliquidated amounts. The unliquidated portion of the Amended Claim, however, was voluntarily withdrawn by Bilzerian at the hearing. Attached to the Amended Proof of Claim were the following: (a) explanation of Proof of Claim signed by Bilzerian; (b) minutes of a special meeting of the Board of Directors of Bicoastal Corporation, dated March 15, 1991, and signed by David A. Tallant; (c) a two page hand written listing of certain items bearing the heading "1988/1989"; (d) minutes of a meeting of Board of Directors of Bicoastal dated January 22, 1991, also signed by David Tallant; and (e) a one page typed statement bearing the heading "From 11/10/89—12/31/89." The Amended Proof of Claim has essentially four components (1) severance benefits of $337,500.00; (2) unpaid wages for June, 1989, of $56,250.00; (3) unpaid vacation pay for 1988 and 1989 of $87,404.00 and (4) loans receivable of $124,162.43, virtually all of which arises from Bicoastal's alleged assumption of $266,000.00 owed by BPLP–1, Ltd. (BPLP–1) to Bilzerian. BPLP–1 is a limited partnership that owns all the common stock of the Debtor. Bicoastal Acquisition Corporation and Bilzerian are the two general partners of BPLP–1.

The Amended Proof of Claim is challenged by the Debtor on the grounds that the Debtor is unable to verify the authenticity of the documents attached to the Proof of Claim to any amounts allegedly owed to the claimant and the Debtor's

books and records indicate that Bilzerian is indebted to the Debtor in an amount that would exceed any claim he has asserted against the Debtor. The facts relevant to the resolution of this controversy, as they appear in the record, are as follows.

### Severance Pay

■ The request for severance pay is the largest single component of Bilzerian's claim, asserted in the amount $337,500.00. It represents more than half of his total claim. It is without dispute that Bilzerian was the CEO of the Debtor between February, 1988 and June, 1989. It is also without dispute that Bilzerian had no written employment contract with the Debtor. It is true that the Debtor's policy manual provided for severance pay to employees, but only when an employee's employment was involuntarily terminated other than for cause. (Debtor's Exhibit 13). It is Bilzerian's contention that he was requested by the Board of Directors to resign and did so on June 29, 1989. It is true that Bilzerian resigned on that date and that he authored three letters of resignation, each consisting of only one sentence, in which he simply resigned his position as Chairman, Chief Executive Officer, and Director effective immediately. (Debtor's Exhibits 8, 9 & 10). However, it is important to note that the corporate minutes immediately preceding Bilzerian's resignation are silent on this subject and make no reference to any request by the Board for his resignation (Exhibits 12, 15). This record leaves no doubt that employees who resigned voluntarily were not entitled to severance pay unless their contract specifically provided for a severance package. There is also no evidence in this record to establish the fact that employees of the Debtor received severance pay, unless the employee had an employment contract which required payments pursuant to the company's stated severance policy. Based upon these facts, this Court is satisfied that there is simply no justification to allow this component of Bilzerian's Amended Claim.

### Claim for Unpaid Wages

■ The next component of Bilzerian's claim is based on the contention that he is entitled to wages earned by him but not paid for the month of June, 1989, in the amount of $56,250.00. There is no dispute that Bilzerian's salary was $56,250.00 per month and he was paid that amount for every month from February, 1988, through May, 1989. There is also no dispute that Bilzerian worked the month of June, 1989, and was not paid solely because of a Court Order that enjoined such payment. It is Bilzerian's contention that he worked several hundred long and difficult hours during June, 1989, and he is entitled to his regular salary for June 1989. Some of the tasks he claimed to have performed during this month include extensive negotiations which resolved a $50 Million lawsuit by Northwest Airlines; the completion of the Royalty Agreement; Trademark Assignment and related agreements with Semi-Tech Microelectronics (Far East) Limited, (Semitech); the disposition of Singer Canada, an affiliate of the Debtor; presiding over two Board of Directors Meetings; and, dealing with various legal, financial and operational matters. In opposition, the Debtor contends that this amount of money was never reflected as a payable on Bicoastal's books and records, nor does it appear on Bilzerian's own printed list of debits and credits to his own account. Nevertheless this Court is satisfied that this component of his Amended Claim is proper and should be recognized subject, however, to the Debtor's right to set-off which is discussed below.

### VACATION PAY

■ The next component of Bilzerian's claim is based on the contention that he is entitled to unpaid vacation pay for 1988 and 1989, totalling $87,404.00, or six weeks of pay for unused vacation time, four weeks in 1988, and two weeks for 1989. Bilzerian testified that he did not take any vacation days during this period of time and was not paid for any vacation days. In opposition, the Debtor asserts that there was no written employment contract be-

tween Bicoastal and Bilzerian detailing Bilzerian's entitlement to vacation or what constituted vacation. Moreover, the evidence shows that Bilzerian was in personal attendance at his criminal trial in New York for a total of 24 business days. Flight logs in evidence also show additional personal travel to Minnesota in mid-January, 1989; to Vail, Colorado, from March 23—28, 1989; to California in early April, 1989; and, trips to Washington, D.C. on non-trial days. (Debtor's Exhibit 34). Bilzerian claims that although he did take 24 days for his six week trial, he continued to work 40—50 hours per week during the trial for the Debtor. This Court is unwilling to accept the proposition that during a highly charged criminal trial Bilzerian had the time or inclination to attend to the affairs of the Debtor. In light of the fact that Bilzerian admittedly took personal trips and spent 24 days attending his trial in another state during his employment by the Debtor, this Court is satisfied that Bilzerian is not entitled to any additional vacation pay for 1988 and 1989. Therefore, the Debtor's objection is sustained and this portion of Bilzerian's Amended Claim is disallowed.

### Loans Receivable

■ The next component of Bilzerian's Amended Claim includes loans receivable of $124,162.43, virtually all of which arises from the Debtor's alleged assumption of $266,000.00 owed by BPLP–1 to Bilzerian. Bilzerian loaned BPLP–1 $266,000.00 in January, 1988, which was in turn loaned to The Singer Company (Singer), the predecessor-in-interest of the Debtor. Both parties concede that the initial opening entry has been reduced by numerous charges to Bilzerian's account. According to Bilzerian, the balance of this loan, $124,162.43, is due and owing to him. This Court is satisfied that Bilzerian's Amended Claim is valid as to the loans receivable, but again this claim is subject to the Debtor's right to set-off, which is discussed below.

### Debtor's Right of Set–Off

■ The Debtor contends that Bilzerian has no allowable claim in this case because he owes the Debtor at least $300,000.00 for the following items: $189,062.00 for legal fees paid for him by the Debtor; $98,453.00 for payment by the Debtor of BPLP–1's 1988 intangible tax; $100,000.00 for a campaign contribution; $130,000.00 for use of the corporate jet; and $4,785.00 in sundry and unspecified charges paid by the Debtor on his behalf.

There is no dispute that the Debtor paid the legal expenses incurred during the SEC investigation and the HSSM litigation. The SEC investigation began in March, 1987, when Bilzerian was served with a subpoena regarding four stocks: (1) Cluett Peabody; (2) Hammermill Paper Company; (3) Armes; and (4) H.H. Robertson. Bilzerian contends that this personal investigation of his various stock dealings ended in October, 1987. Bilzerian further contends that the 1988 SEC investigation was a new investigation directed at or caused by the acquisition of Singer and, therefore, Singer should pay all legal fees. It is important to note, however, that the SEC complaint consisted of 75 pages, and only pages 63–68 were devoted to Bilzerian's take over of Singer. In fact, Singer was not even a defendant in the SEC action.

The HSSM litigation began in April, 1989, when HSSM filed suit against Singer and Bilzerian in Texas. The suit against Singer alleged the breach of an oral contract between HSSM and Singer which required Singer to pay HSSM $45 million for an investment. Bilzerian then filed suit against HSSM in Tampa for declaratory relief seeking a judicial determination that Singer could not be an obligor to HSSM because it had tendered its investment to Bilzerian. Bilzerian authorized Singer to reimburse his legal fees because he felt that by filing the Tampa suit he was relieving Singer of any potential liability. It is important to note, however, that the Debtor was never a party to the Florida litigation. The only parties to the Florida litigation were Bicoastal Financial Corporation and Paul A. Bilzerian.

■ These legal expenses were clearly Bilzerian's personal legal expenses which

should have been paid by Bilzerian and not by the Debtor. It is generally recognized that corporate officers are entitled to indemnification when they are sued for action taken by them in their official capacity and they are acting on behalf of the corporation. It is equally true, however, that when corporate officers and directors are sued for actions that are not connected or relevant to the performance of their official duties, they are not entitled to indemnification. For obvious reasons, promoting or protecting the personal interests of an officer or director is not sufficiently in the best interest of the Debtor corporation to justify the reimbursement of his legal expenses. In this instance, Bilzerian was clearly promoting and defending his own personal interest and not the interest of the Debtor. Therefore, Bilzerian is not entitled to the reimbursement of his legal expenses incurred in connection with the SEC investigation and the HSSM litigation.

■ It is undisputed that the Debtor paid BPLP–1's intangible tax return for the year ended December 31, 1987, in the amount of $98,453.00. There is nothing in this record to justify this payment by the Debtor. Singer made no election to pay the intangible tax for its shareholders, as claimed by Bilzerian. Moreover, the leveraged buyout had not yet been accomplished at the time of the payment.

■ There is no dispute that Bilzerian authorized the payment of $100,000.00 to the Republican National State Elections Committee by the Debtor. Contemporaneously with the transfer of this $100,000.00, Bilzerian's personal account was charged $100,000.00 as a loan receivable. More than eighteen months later, Bilzerian ordered that this transaction be reversed and treated as a corporate expense rather than as an individual contribution. This Court is satisfied that the contribution was clearly for the benefit of the Debtor and was made in expectation that the Debtor would receive favorable treatment of its defense contracts with the Government. The fact that the check was issued by Bilzerian and sent with a letter on his personal letterhead is of no consequence. Therefore, Bilzerian

was entitled to reverse the transaction and credit his personal account as reimbursement for this political contribution.

■ The next offset item involved Bilzerian's use of the corporate jet owned by the Debtor. There is no dispute that from January 1, 1989, through August 29, 1989, Bilzerian repeatedly used the Lockhead corporate jet owned by the Debtor and, according to the evidence, flew at least 118 flight segments. (Debtor's Exhibit 34). Among the destinations flown by Bilzerian were Bilzerian's summer home in Minnesota, his father-in-law's home in Sacramento, California, and various well known resort locations such as Vail, Colorado, Aspen, Colorado, Marco Island, Florida, Martha's Vineyard, Massachusetts, and Reno, Nevada. As per the July 28, 1989 lease agreement, Bilzerian agreed to compensate the Debtor for personal use of the corporate jet at $1,000.00 per hour. Bilzerian contends that he has already fully compensated the Debtor for all personal use of the corporate jet. According to the Debtor, however, Bilzerian still owes the Debtor more than $68,430 for pre-petition personal use of the aircraft and $62,000.00 for post-petition personal use of the aircraft, totalling $130,670.00. This Court is satisfied that the additional trips charged to Bilzerian are unrelated to any business purpose of the Debtor, but are rather trips associated with matters personal to Bilzerian. Therefore, Bilzerian, and not the Debtor, benefitted from the use of the corporate jet and should be responsible for his personal flight hours, in accordance with the lease agreement.

■ The Debtor also contends that Bilzerian is responsible for additional sundry items totalling $4,785.00. The largest single item in this category is a charge of $2,000.00 to place a personal tribute in a publication of the Royal Palm Polo Sports Club. At trial, Bilzerian admitted that this item should properly be charged to his personal account. The second largest item is $1,944.52 for a dinner at Giambelli's Restaurant in New York City on June 7, 1989. Bilzerian did not introduce any evidence to

indicate that this was a proper business expense chargeable to the Debtor. Therefore, Bilzerian should be charged for these two items totalling $3,944.52. As for the remaining items, Bicoastal failed to identify which items are included in the $4,785.00 figure, with the exception of the tribute and the dinner, and therefore, this Court is unable to determine what expenses are in question and who should be responsible for the expenses. Therefore, the Debtor is not entitled to offset the remaining $840.48 against the Amended Claim.

■ This Court is satisfied that the Debtor also has a right to setoff the amount Bilzerian received in excess of his monthly salary for the period from January 1, 1989, up to June, 1989. As discussed earlier, Bilzerian is entitled to payment of his salary for the month of June, 1989. However, the Debtor paid Bilzerian $1,555,-620.98 as compensation for the period from January 1, 1989, up to May, 1989. Of the $1,555,620.98 received, $1,200,000.00 was paid to Bilzerian in June, 1989, the same month he resigned, for unspecified reasons. There is no doubt that the $1,200,000.00 is above and beyond the amount Bilzerian would or could be entitled to for wages. The Debtor is, therefore, entitled to offset this amount against the Amended Claim.

■ In sum, while it is clear from the record that Bilzerian has an Amended Claim for the amount of his unpaid wages for the month of June, 1989, in the amount of $56,250.00, the loans receivable in the amount of $124,162.43, and reimbursement for the political contribution in the amount of $100,000.00, all of which totals $280,-412.43, this record fully justifies the conclusion that the Debtor has a right to setoff which substantially exceeds the claim of Bilzerian. As previously discussed, the Debtor has the right to setoff the following expenses: $189,062.00 for legal fees; $98,-453.00 for intangible tax; $130,670.00 for personal use of the corporate jet; $2,000.00 for a personal tribute; $1,944.52 for a dinner at Giambelli's Restaurant; and $1,200,-000.00 for money paid to Bilzerian in June, 1989 for unspecified reasons, all of which totals a setoff of $1,622,129.52. Therefore,

since Bilzerian is indebted to the estate in an amount greater than his Amended Claim, the Objection to the claim is sustained and the Amended Claim of Bilzerian should be disallowed.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Objection filed by the Debtor be, and the same is hereby, sustained and claim # 3576 filed by Paul A. Bilzerian is disallowed in its entirety. It is further

ORDERED, ADJUDGED AND DECREED that the Debtor be, and is hereby, entitled to file a proof of claim for the setoff amount in Paul Bilzerian's individual Chapter 7 case.

DONE AND ORDERED.