In re Terri L. STEFFEN, Debtor.

Terri L. Steffen, Appellant/Cross–Appellee,

v.

United States of America, Appellee/Cross–Appellant.

No. 8:08–cv–2337–T–24.

United States District Court, M.D. Florida, Tampa Division.

April 28, 2009.

**34**

Edward J. Peterson, III, Stichter, Reidel, Blain & Prosser, PA, Tampa, FL, for Terri L. Steffen.

Mary Apostolakos Hervey, U.S. Department of Justice - Tax Division, Washington, DC, for U.S.

### ORDER

SUSAN C. BUCKLEW, District Judge.

This cause comes before the Court on an appeal and cross-appeal of certain orders from the bankruptcy court. The parties have fully briefed the issues on appeal. (Doc. No. 10, 20, 31). Upon review of the record, the Court finds that the bankruptcy court's decisions should be affirmed in part and reversed in part.[1]

### I. Background

This is just one of many appeals in the Terri L. Steffen bankruptcy case. The issues on appeal in this case relate to the IRS's $5,856,721.11 claim in Steffen's bankruptcy case and Steffen's objection thereto. Specifically, Steffen challenges the claim to the extent that it is affected by the IRS's treatment of certain taxable events, namely: the worthlessness of her Bicoastal stock, the alleged theft of her money by her interior designer, and the alleged bad debt she wrote off. She filed the tax returns at issue jointly with her husband, Paul Bilzerian.

The major, and hotly contested, issue in this appeal is the determination of what year the Bicoastal common stock became worthless. The Bicoastal common stock[2] was owned by a limited partnership, BPLP–1, in which Bilzerian and his com-

---

1. The bankruptcy record was not docketed in this case. Instead, for documents not accessible via PACER, the bankruptcy court forwarded the original file to the undersigned's Chambers. For documents accessible via PACER, the undersigned printed and reviewed those documents in Chambers. References to bankruptcy documents are indicated as "(BR Doc. No. ——)."

2. Bicoastal was originally named Singer, and the name changed to Bicoastal in 1989.

pany, Bicoastal Acquisition Corporation, were general partners, along with five other limited partners. Thus, Bilzerian and Steffen owned Bicoastal's common stock indirectly through their ownership of BPLP–1.

In 1989, several events occurred that Steffen argues caused the Bicoastal stock to become worthless that year. Specifically, Steffen points out that claims were filed against Bicoastal totaling more than $500 million, Bicoastal defaulted on some of its debt obligations, and on November 11, 1989, Bicoastal filed a voluntary petition seeking Chapter 11 bankruptcy relief. As a result, Steffen amended her 1989 tax return in June of 1991 to reflect that the Bicoastal stock became worthless in 1989.

The IRS, however, contends that while those events caused the Bicoastal stock to have no current liquidation value in 1989, the stock still had potential future value until Bicoastal's claims against Semi–Tech under their royalty agreement were settled in 1993 for far less than Bicoastal had valued its claims (Bilzerian valued Bicoastal's claims against Semi–Tech at more than $500 million). As such, the IRS took the position that the stock did not become worthless until 1993.

The bankruptcy court agreed with the Government, finding that the cumulative effect of the events that occurred in 1989 did not leave the Bicoastal stock without any potential future value by the year end.[3] Instead, the bankruptcy court determined that the stock did not become worthless until 1993 based on the following: (1) in 1990, Bilzerian indirectly transferred interests in Bicoastal in full satisfaction of debts totaling $7.5 million; (2) in 1991, Bilzerian granted an indirect interest in Bicoastal as collateral for a $9.5 million loan from Oxley[4]; (3) Bilzerian represented to the Chapter 7 trustee in his bankruptcy case that BPLP–1, whose primary asset was the Bicoastal stock, had significant value; (4) in 1993, prior to resolution of the Semi–Tech litigation, Bilzerian and Steffen attempted to transfer a 25% interest in BPLP–1 to Bilzerian's Chapter 7 trustee in order to settle claims against Bilzerian; (5) Bilzerian and his Chapter 7 trustee objected to the $92 million settlement of the Semi–Tech litigation because they believed that the value of Bicoastal's claims against Semi–Tech (the primary asset of Bicoastal) was substantially higher; and (5) Steffen, as president of Loving Spirit Foundation, listed its interest in BPLP–1 as an asset in the amount of $595,830 on its 1993 tax return.

Steffen also argued that if the Bicoastal stock did not become worthless in 1989, then it certainly became worthless, at the very latest, in 1992, when Bicoastal's common stock was cancelled under the plan confirmed by the bankruptcy court in Bicoastal's bankruptcy case. The bankruptcy court rejected this argument, noting that even though the common stock was technically cancelled, the sole common stockholder (BPLP–1), could still potentially recover money under the plan based on its prior stock ownership, because the amended confirmed plan provided that BPLP–1 would receive money if the assets of Bicoastal (which, at that time, consisted of the claims against Semi–Tech) were sufficient to pay the creditors and preferred

---

**3.** A stock is worthless if it has no present value and no reasonable prospect of future value. *See Wagner v. U.S.*, 2003 WL 691029, at *4 (M.D.Fla. Jan. 21, 2003)(citing *Miami Beach Bay Shore Co. v. C.I.R.*, 136 F.2d 408, 409 (5th Cir.1943)).

**4.** On page 14 of its initial order, the bankruptcy court referred to the amount loaned by Oxley as $13 million, but it correctly identified the amount as $9.5 million on page 20 when using it to reduce Steffen's basis in the Bicoastal stock.

stockholders. It was not until 1993, when the Semi–Tech case was settled for only $94 million, that one could determine that BPLP–1 would not receive any money for the shares of the Bicoastal common stock it held prior to their cancellation.

In addition to finding that the year that the Bicoastal stock became worthless was 1993, the bankruptcy court also determined: (1) Steffen's adjusted basis in the stock, (2) whether she was entitled to a theft loss deduction in 1991, and (3) whether she was entitled to a bad debt deduction in 1993. On September 16, 2008, after the bankruptcy court made these determinations, the bankruptcy court issued its final order determining Steffen's income tax liabilities for 1991, 1992, and 1993. (BR Doc. No. 612). Thereafter, the parties appealed the order, based on the underlying determinations regarding the Bicoastal stock, theft loss deduction, and bad debt deduction.

## II. Standard of Review

This Court conducts a *de novo* review of the bankruptcy court's legal conclusions and must accept the bankruptcy court's factual findings unless they are clearly erroneous. *See In re JLJ, Inc.*, 988 F.2d 1112, 1116 (11th Cir.1993). A factual finding is clearly erroneous if a review of all of the evidence leaves this Court with the definite and firm conviction that a mistake has been made. *See General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1494 (11th Cir.1997).

The determination of the year in which a stock become worthless is a factual finding, and the taxpayer has the burden to prove her entitlement to the deduction by a preponderance of the evidence. *See Boehm v. C.I.R.*, 326 U.S. 287, 293–94, 66 S.Ct. 120, 90 L.Ed. 78 (1946); *Genecov v. U.S.*, 412 F.2d 556, 560 (5th Cir.1969);

*Wagner v. U.S.*, 2003 WL 691029, at *3 (M.D.Fla. Jan. 21, 2003); *Figgie Int'l, Inc. v. C.I.R.*, 1985 WL 14990 (U.S.Tax Ct. July 23, 1985). Likewise, the question of whether a debt has become worthless is also a question of fact, and the taxpayer has the burden to prove her entitlement to the deduction by a preponderance of the evidence. *See Quinn v. C.I.R.*, 111 F.2d 372, 373 (5th Cir.1940); *Southwestern Life Ins. v. U.S.*, 560 F.2d 627, 644 (5th Cir. 1977). Finally, the taxpayer also must prove her entitlement to a theft loss deduction by a preponderance of the evidence. *See Kaplan v. U.S.*, 2007 WL 2330841, at *5–6 (M.D.Fla. Aug. 15, 2007); *Yates v. C.I.R.*, 1988 WL 131493 (U.S.Tax Ct. Dec. 13, 1988).

## III. Issues on Appeal

Steffen raises two issues on appeal: (1) the year that the Bicoastal stock became worthless, and (2) her adjusted basis in the stock. The Government also raises two issues on appeal: (1) whether Steffen was entitled to take the 1991 theft loss deduction, and (2) whether Steffen was entitled to take the 1993 bad debt deduction. Accordingly, this Court will address each issue.

### A. Year Bioastal Stock Became Worthless

On January 6th and 7th of 2003, the bankruptcy court held an evidentiary hearing to determine the year in which the Bicoastal stock became worthless. (BR Doc. No. 185). Thereafter, on April 18, 2003, the bankruptcy court found that the Bicoastal stock did not become worthless until 1993. (BR Doc. No. 162). Steffen moved for reconsideration, and the bankruptcy court held a hearing on the matter on December 2, 2003. (BR Doc. No. 225). On February 4, 2004, the bankruptcy court issued its order affirming its decision that

the Bicoastal stock did not become worthless until 1993. (BR Doc. No. 233).

Steffen now appeals the bankruptcy court's finding that the Bicoastal stock did not become worthless until 1993. This Court has read all of the transcripts of the above referenced hearings. Based on the evidence before the bankruptcy court, this Court finds that the bankruptcy court's factual finding that the Bicoastal stock did not become worthless until 1993 is not clearly erroneous.

Nevertheless, Steffen argues that the bankruptcy court made several errors. However, none of her arguments have merit. The Court will address each argument in turn.

Steffen argues that the bankruptcy court improperly applied the presumption of correctness. This argument has no merit, as the bankruptcy court stated in its order on reconsideration that even if the presumption lost its probative force, Steffen "nevertheless failed to establish by a preponderance of the evidence that the deduction in 1989 was proper." (BR Doc. No. 233, p. 5).

Next, Steffen argues that the Government failed to prove that the Bicoastal stock had value on December 31, 1989, December 31, 1990, December 31, 1991, and December 31, 1992. This argument has no merit, as the burden is on Steffen to prove her entitlement to the deduction, and the bankruptcy court found that Steffen did not show that the Bicoastal stock became worthless prior to 1993.

Next, Steffen argues that the bankruptcy court erred by considering the value of the Semi–Tech lawsuit to Bicoastal, since that lawsuit was not filed until 1990, and as such, its value cannot be used to support a finding that it had value to Bicoastal in 1989. This argument is flawed. The bankruptcy court found that the Bicoastal

stock still had value in 1990 as evidenced by the fact that it was used as collateral in certain transactions in 1990. Therefore, since the bankruptcy court found that the Bicoastal stock still had value in 1990 (after Bicoastal had filed for bankruptcy in November of 1989), it could then consider other events that occurred in 1990 in order to determine if 1990 (or 1991 or 1992) was the year in which the Bicoastal stock became worthless.

Next, Steffen argues that the bankruptcy court failed to give deference to Steffen's determination of the year of loss. This argument has no merit. It is clear that the bankruptcy court considered the year in which Steffen believed that the stock became worthless, but the court found that other evidence was more probative and supported a finding that the year was 1993.

Next, Steffen argues that the bankruptcy court made an erroneous factual finding when it found that Bilzerian borrowed $13 million from Oxley in 1991. (BR Doc. No. 162, p. 14). This statement must be read in context, which is that the bankruptcy court discussed the 1991 transaction in which Bilzerian used the Bicoastal stock as collateral for a loan from Oxley. Even if the loan was made in 1987 and 1988 as Steffen contends, there was evidence before the bankruptcy court that in 1991 a transaction occurred between Bilzerian and Oxley in which Bilzerian used Bicoastal stock as collateral for money he still owed to Oxley. (BR: Gov. Ex. 44 to Jan. 6–7, 2003 evidentiary hearing). Furthermore, while it appears that the bankruptcy court may have erred as to the amount owed to Oxley, such error was harmless, as the bankruptcy court used the proper loan amount of $9.5 million later in its order when adjusting Steffen's basis in the Bicoastal stock.

Next, Steffen argues that the bankruptcy court erred when it found that Bilzerian represented to his bankruptcy trustee that BPLP-1 (in which its 100% ownership of Bicoastal's common stock was its primary asset) had significant value, because that finding is false and irrelevant. This argument is flawed. There was evidence before the bankruptcy court that in March of 1993 Steffen and Bilzerian attempted [5] to settle certain bankruptcy claims against Bilzerian by giving a 25% interest in BPLP-1 as part of the consideration under the settlement agreement. (BR Doc. No. 185, p. 240–45, 326–32). There is also Bilzerian's acknowledgment that he had stated to others that BPLP-1 "might possibly" have value or that it could have value under certain circumstances. (BR Doc. No. 185, p. 263). Additionally, documents were filed in Bilzerian's bankruptcy case that indicate that Bilzerian represented to his bankruptcy trustee that BPLP-1 had significant value. (BR: Gov. Ex. 40, 45 to Jan. 6–7, 2003 evidentiary hearing). Together, all of this evidence is sufficient for this Court to find that the bankruptcy court's factual finding that Bilzerian represented to his bankruptcy trustee that BPLP-1 had significant value was not clearly erroneous.

Nor was that factual finding irrelevant, as claimed by Steffen. Steffen argues that since the alleged statement was made in 1993, it is irrelevant as to whether Bicoastal had any value in 1989—the year she claims that Bicoastal became worthless. However, this finding supports the bankruptcy court's ultimate conclusion that Bicoastal still had value at the beginning of 1993 and then became worthless by year end.

Next, Steffen argues that the bankruptcy court erred when it made the factual finding that Loving Spirit Foundation (a charitable organization in which Steffen was the president) reported its interest in BPLP-1 as an asset in the amount of $595,830. This argument has no merit. Steffen testified that Loving Spirit Foundation's 1993 tax return reflected its investment in BPLP-1 as being $595,830, and the tax return was put into evidence. (BR Doc. No. 185, p. 345–48; BR: Gov Ex. 55 to Jan. 6–7, 2003 evidentiary hearing). Furthermore, this is relevant, because it is additional evidence that Bicoastal still had value at the beginning of 1993 and then became worthless by year end.

Thus, the bankruptcy court did not err when it found that the Bicoastal stock did not become worthless until 1993. As such, this Court affirms the bankruptcy court on that issue.

### B. Adjusted Basis of the Stock

On January 6th and 7th of 2003, the bankruptcy court held an evidentiary hearing to determine Steffen's adjusted basis in the Bicoastal stock. (BR Doc. No. 185). Thereafter, on April 18, 2003, the bankruptcy court found that Steffen's adjusted basis in the Bicoastal stock was $4,766,705. (BR Doc. No. 162). Steffen moved for reconsideration, and the bankruptcy court held a hearing on the matter on December 2, 2003. (BR Doc. No. 225). On February 4, 2004, the bankruptcy court issued its order affirming its decision that Steffen's adjusted basis in the Bicoastal stock was $4,766,705. (BR Doc. No. 233).

In the instant appeal, Steffen argues that the bankruptcy court erred in its calculation of her basis in the stock. Steffen argued that the initial basis was approxi-

---

**5.** This settlement was not consummated, because it was not approved by the bankruptcy court.

mately $30 million, despite the fact that she listed the basis on her tax return as only slightly more than $23 million. The bankruptcy court did not make a clearly erroneous factual finding when it found that the initial basis of the stock was approximately $23.3 million given the incomplete evidence before the bankruptcy court to substantiate the stock purchases.

Next, the bankruptcy court reduced the initial basis by the amount of money used to buy the stock that was generated by loans that were later forgiven. The bankruptcy court determined that the amount of the reduction should be $18.6 million, which is comprised of (1) $7.4 million loaned by Forgason, Forgason's related entities, and Roth; (2) $9.5 million loaned by Oxley; and (3) $1.6 million loaned from Bicoastal Holding Company.[6] These findings are not clearly erroneous as they are supported by the record. (BR Doc. No. 185, p. 224, 227–28, 237–39, 272–74, 312–15, 414). As such, the bankruptcy court's factual finding that Steffen's basis in the Bicoastal stock was $4,766,705 is not clearly erroneous, and the bankruptcy court is affirmed on this issue.

### C.  Theft Loss Deduction

■ On March 27, 2003, the bankruptcy court held an evidentiary hearing on the issue of whether Steffen was entitled to take the 1991 theft loss deduction. (BR Doc. No. 160: hearing transcript [7]). This theft loss deduction is based on the allegation that Michelle Skeen told Steffen that she would provide interior decorating services in order to receive money from Steffen that Skeen kept for herself. As a result, Steffen claimed a theft loss deduction of $114,737 in 1991. The Government challenged this deduction, arguing that (1) the loss belonged to Bicoastal, not Steffen, and (2) Steffen did not prove that the loss occurred in 1991.

On June 27, 2003, the bankruptcy court entered an order in which it found that Steffen was not entitled to take the theft loss deduction. (BR Doc. No. 186). Specifically, the bankruptcy court made the following factual findings: (1) the loss was not a personal loss, because the transaction was between Skeen and Bicoastal, as evidenced by the invoices being directed to Bicoastal and Bicoastal making the majority of the payments to Skeen; (2) Bicoastal was a corporation with a separate legal identity apart from Steffen, and thus, Steffen could not claim Bicoastal's loss; (3) Steffen had not shown that a theft occurred; rather, the evidence supported fraud; and (4) Steffen did not show that there was no reasonable prospect of recovery of the funds in 1991.

Thereafter, Steffen moved for reconsideration, and the bankruptcy court held a hearing on January 14, 2004. (BR Doc. No. 231: hearing transcript [8]). In the motion for reconsideration, Steffen raised a new argument—that there was evidence that the transaction was between Steffen and Skeen based on the bankruptcy court's factual findings on April 5, 1995 in a different trial in which the Government was not a party. (BR Doc. No. 214) Thus, Steffen argued, since the bankruptcy court in 1995 found that the transaction at issue was between Steffen and Skeen (not Skeen and

---

6. These loan amounts are approximations, as the total of the listed amounts equals $18.5, not $18.6, million.

7. The relevant portion of this transcript regarding the theft loss deduction is pages 25–46, 165–167, and 171–72.

8. The relevant portion of this transcript regarding the theft loss deduction is pages 41–43, 52–57, and 61–67.

Bicoastal), that factual finding must apply in this case.

At the hearing on the motion for reconsideration, it appears that the bankruptcy court accepted Steffen's argument that its factual findings in the 1995 trial to which the Government was not a party could be used as conclusive evidence supporting the theft loss deduction. (BR Doc. No. 231, p. 65). After the hearing, on March 26, 2004, the bankruptcy court granted reconsideration and found that Steffen was entitled to the 1991 theft loss deduction. (BR.Doc. No. 250). The bankruptcy court based its decision on "the reasons set forth in open Court and set forth in the Debtor's Motion for Reconsideration." (BR Doc. No. 250, p. 2). Thereafter, the Government attempted to address this issue again in a hearing on April 20, 2004, but the bankruptcy court would not entertain any argument. (BR Doc. No. 274, p. 69–71).

In the instant appeal, the Government argues that: (1) there was no evidence of theft; (2) the evidence showed that the loss was not personal to Steffen, as most of the checks were written from Bicoastal's account; (3) Steffen did not show that there was not a reasonable prospect of recovery in 1991; (4) the evidence as to the amount of the loss was substantially less than the attempted deduction; and (5) the bankruptcy court erred in considering factual findings made in a different case in which the Government was not a party as conclusive evidence as to the issue of the allowability of the deduction.

This Court is troubled by the fact that the bankruptcy court completely reversed its factual findings based only on findings it made in a different case to which the Government was not a party. Furthermore, these factual findings from the other case were made in 1995, and as such, even if those factual findings could properly be considered, they should have been submitted in the initial evidentiary hearing on the theft loss deduction.

After considering the evidence set forth at the initial evidentiary hearing, the bankruptcy court found that the loss was not personal to Steffen. This conclusion was based on the evidence at the hearing, which included evidence that the majority of the money (about $90,000) was paid by Bicoastal and that Skeen invoiced Bicoastal, not Steffen. (BR Doc. No. 160, p. 39–41). This was the proper evidence to be considered. Steffen was free to submit the same evidence that supported the bankruptcy court's finding in the 1995 case, but she did not do so.

Additionally, at the initial hearing, Bilzerian testified that when Skeen filed for bankruptcy, he filed a proof of claim regarding the alleged theft in the amount of $68,000–not the $114,737 now claimed as a deduction. (BR Doc. No. 160, p. 31). He explained the difference in amounts was due to him subtracting every amount that could possibly be disputed from the $114,737 claim in order to come up with a conservative estimate of the loss as $68,000. (BR Doc. No. 160, p. 31–33). The bankruptcy court never addressed this discrepancy when it concluded on reconsideration that the entire $114,737 claimed loss would be allowed.

■ Finally, Steffen's argument on reconsideration regarding the bankruptcy court's initial finding that she failed to show that there was not a reasonable prospect of recovery in 1991 is flawed. Specifically, she argued that she was not required to show that she made any effort to recover the loss in order to claim the deduction. Regardless, the evidence before the bankruptcy court was that she *did* pursue recovery against Skeen in both Skeen's bankruptcy case and in state court, and her action, while not dispositive, may show

that she believed that there was a reasonable prospect of recovery against Skeen in 1991.[9] However, there was very little evidence before the bankruptcy court from which that court could determine when there was no reasonable prospect of recovery, especially given the fact that the testimony at the hearings about the theft and the response thereto is devoid of dates. Therefore, there does not appear to be a basis for a finding that the there was not a reasonable prospect of recovery of the loss in 1991, which is a required element of proof for a theft loss deduction.[10]

Thus, based on the evidence before the bankruptcy court, this Court is persuaded that the bankruptcy court erred in allowing the theft loss deduction. When it considered the evidence at the initial hearing, the bankruptcy court determined that Steffen was not entitled to the theft loss deduction, and this Court finds that the evidence supported that finding. The bankruptcy court's initial decision disallowing the theft loss claim must stand, as Steffen's arguments made in support of reconsideration were based on factual findings in a different 1995 case to which the Government was not a party, and the bankruptcy court made no new factual findings to support its allowance of the deduction. As such, the bankruptcy court

erred when it found on reconsideration that Steffen was entitled to the theft loss deduction, and this Court reverses the bankruptcy court on that issue.

### D. Bad Debt Deduction

■ On March 27, 2003, the bankruptcy court held an evidentiary hearing on the issue of whether Steffen was entitled to take the 1993 bad debt deduction. (BR Doc. No. 160: hearing transcript[11]). This bad debt deduction is based on money allegedly loaned to Bicoastal but not repaid. As a result, Steffen claimed a bad debt deduction of $124,612 in 1993. The Government challenged this deduction, arguing that Steffen failed to offer evidence establishing that a bonafide business debt existed.

On June 27, 2003, the bankruptcy court entered an order in which it found that Steffen was not entitled to take the bad debt deduction. (BR Doc. No. 186). Specifically, the bankruptcy court found that Steffen failed to produce any written evidence of a bonafide debt, nor was there any testimony regarding the terms of the alleged loan.

Thereafter, Steffen moved for reconsideration, and the bankruptcy court held a hearing on January 14, 2004. (BR Doc. No. 231: hearing transcript[12]). In the

9. "The 'reasonableness' of a taxpayer's prospect of recovery is primarily tested objectively, although a court may consider to a limited extent evidence of the taxpayer's subjective contemporaneous assessment of his own prospect of recovery." *Jeppsen v. C.I.R.*, 128 F.3d 1410, 1418 (10th Cir.1997) (citations omitted).

10. In order for a theft loss deduction to be allowed, the loss must be evidenced by a closed and completed transaction. 26 C.F.R. § 1.165–1(b). The treasury regulations explain: "Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss.... However, if in the year of discovery there

exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of [the theft loss deduction] ..., until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received." 26 C.F.R. 1.165–1(d)(3).

11. The relevant portion of this transcript regarding the bad debt deduction is pages 55–62 and 172–173.

12. The relevant portion of this transcript regarding the bad debt deduction is pages 41–43, 46–52, and 57–61.

motion for reconsideration, Steffen argued that the bankruptcy court's finding that she did not establish a bonafide loan was wrong for two reasons: (1) she did not need to offer written proof of the loan and its terms; and (2) the decision conflicted with the bankruptcy court's earlier ruling in 1993 in the Bicoastal bankruptcy case, in which the bankruptcy court found Steffen's proof of claim against Bicoastal for the unpaid loan balance of $124,162 to be valid. After the hearing, on March 26, 2004, the bankruptcy court granted Steffen's motion for reconsideration and allowed the bad debt deduction based on Steffen's arguments and based on the bankruptcy court's acknowledgment at the initial hearing that it found Steffen's proof of claim in the Bicoastal bankruptcy proceeding to be a valid claim. (BR Doc. No. 250; BR Doc. No. 160, p. 172–73).

In the instant appeal, the Government argues, among other things, that Steffen was not entitled to the deduction because the alleged debt did not meet the requirements of 26 U.S.C. § 166(a). Specifically, § 166(a) provides that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year."

The Government argues that the alleged debt continued to have value in 1993, and thus, it could not be deemed a bad debt. Specifically, the Government points out, and it is undisputed, that in 1993 the entire amount of the alleged debt–$124,162–was set off against amounts owed to Bicoastal. (BR Doc. No. 160, p. 172–73); *In re Bicoastal,* 158 B.R. 240, 245 (Bankr.M.D.Fla.1993)(finding that Bicoastal owed Bilzerian $124,162, and then setting off the entire amount by the amount Bilzerian owed Bicoastal). Therefore, the Government argues, the debt could not be considered worthless. This Court finds that the bankruptcy court erred in finding that a bad debt deduction was allowable

under the undisputed facts of this case. As such, this Court reverses the bankruptcy court on this issue.

### IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that this Court affirms the bankruptcy court on the issues of the year that the Bicoastal stock became worthless and Steffen's adjusted basis in the stock. However, this Court reverses the bankruptcy court's decision on reconsideration that (1) Steffen was entitled to the theft loss deduction of $114,737 in 1991, and (2) Steffen was entitled to the bad debt deduction of $134,162 in 1993. This case is remanded, and the bankruptcy court is directed to vacate its order on reconsideration of the theft and bad debt deductions (BR Doc. No. 250) and its final order determining Steffen's 1991, 1992, and 1993 income tax liabilities (BR Doc. No. 612) and to recalculate the amount based on this Court's order. The Clerk is directed to close this case.